University of Puerto Rico Retirement System v. Ocwen Financial Corporation. Okay, Mr. Berg. If it pleases the court, your honors, Ian Berg on behalf of the appellant, the plaintiffs and the underlying action. The essence of this case is not just the specific 30 or so false statements and omissions alleged. Rather, this case is about a greater intended deception to mislead the market about Auckland's ability to remediate its mortgage servicing illegalities as required by regulatory consent orders, including with 49 attorneys general. To carry out that deception . . . It's a corporation that is having lots of problems with state attorneys general and regulatory authorities, acknowledges that it's having that, it's paying amounts, it's remediating problems they've identified, and it believes that it's going to do better in the future. I look at that and I think, sure, you've got a lot of problems there. I don't take that to be any more than, we're going to try to do better. Addressing the statements that are alleged to be puffery or immaterial puffery of just promises to do better, the deception here is in the lie. The deception is in . . . You can't have soft words within a statement that's misleading and have that inoculate the whole overarching deception that the technology would certainly and inevitably fail. That renders even true statements misleading. If I could make an analogy, if I'm running a train and I'm picking up passengers in New Orleans and dropping them off in Atlanta, I can make statements all along the way with each mile of, we're making progress towards our destination and I really believe we're going to get there and things are going well. But if I know that there is a hole in the tracks in Birmingham or that the engine will not make it the entire distance, then I have misled those passengers. And even if I give a warning ahead of time, I'm picking you up, I'm taking you to Atlanta, I believe that I will get there, we are a great railroad, but things might happen. The track might break, the engine might fail. If I know that that has already happened, then I have misled the passengers and that's what happened here. But don't we have a situation here where everybody knew there was a hole in the track? No. Everybody knew that Auckland had servicing issues. The extent of the issues and the extent of the flaw of technology was not known. But the fact of it was they had a problem. The problem came from a broken technology. But the extent of the break or that the technology was broken versus the ability to service the mortgages is what separates mismanagement from the fraud. So if you can then put your finger, it sounds now like we're talking about principally an omissions case. If you can put your finger precisely on the omission, what precisely was the omission? The precise omission was that technology could not be remediated so that all of the servicing issues could be fixed. Auckland could make progress towards fixing some of the servicing issues that resulted from the flawed technology. What they should have told the investing world is we're incapable of fixing this problem. Exactly. And anything less than that is fraud in your view. I do believe that. And that's what happened with the second round of regulatory actions that took place at the end of the class period. Real servicing technology platform was required to be exchanged for a new technology platform that had the ability to fix these issues. Was Auckland taking any steps, whether they were actually making progress or not, was Auckland taking any steps once the regulators stepped in to fix the problem, to try and fix the problem? Well, I want to differentiate the problem because there are servicing problems and illegalities. The technology that you say cannot be fixed. Even if you could put a band-aid on some of the problems with the technology, the overall fix reaching the end, reaching Atlanta could not happen unless that technology system was replaced. And they were not replacing it. They were not making efforts to replace it. Were they trying to fix it? I don't know what efforts were being made to try and fix the technology, specifically separate and apart from the servicing issues because that was never explained. And it should have been explained. It's material information. But if you don't know what steps, if any, Auckland is actually taking to try and fix the technology, isn't that a massive hole in your complaint? No, because what we have from the results of an internal investigation by the company, from the results of an outside external consultant coming in to look at the technology, and most importantly from internal communications from executive officers to the CEOs saying this technology is broken. It is a train wreck. And the response is keep doing what we're doing. Keep trying to pacify the consumers who call in and have these problems fixed. There were emails saying, well, we're working on it. Hopefully we'll find a solution. We're making progress. It is, this system is broken. It's a train wreck. Keep doing what we're doing. And that is exactly why the technology had to be removed with the second round. So what we're doing might, can mean though, keep all these things that we're doing to discover the problems and to remediate it. I mean, they were actually working with the technology too, right? You say right because you're making an assumption based on what would normally occur in a corporation. But those facts are not in evidence. Those statements are not in evidence. And this is a pleading standard. We assume that they're making technology fixed, but we don't see any evidence of that. When reports come, you can't say that they knew about problems discovered in the internal investigation and discovered by the external consultant before the internal investigation occurred and the external consultant came in and did that examination. These are new issues being raised. And we see no response that is, well, let's try and fix them. Let's get to work on it. All you see is... Let me ask you this. Is your point that the underlying software issue was physically or technically incapable of being fixed or that it was cost prohibitive to fix it? Incapable. Or something in the code that cannot be fixed, I guess, even by sort of rewriting code or whatever. Exactly. It was a flawed technology that could not be fixed. So, but I guess I don't even quite understand it. Like it couldn't be reinvented? It would have to start from scratch. So really, though, your point is, is not that it couldn't be fixed, is that it was cost prohibitive to fix it or time prohibitive or something. I can't say that it was cost prohibitive. I can look at the facts in the record and say why the company would decide to keep the technology. They developed it in-house. They spun it off. The executive chairman of Ocwin was the chairman of this new company. This new company allowed them to assist in financing the acquisition of more rights. That's part of the 2016 consent decree that those decisions were made without following  So there's ulterior motives to keeping this technology in place that are facts that are alleged in the complaint. But I can't tell you specifically it was cost prohibitive and that's why they did it. Obviously, it had a huge impact on the cost. It's a couple of billion dollars. And the narrative here is that the market knew of these problems and investors had to make a bet as to whether or not Ocwin could fix it or not. But it becomes misleading because it's a rigged result. And that's akin to the language and basic of rolling dice in a rigged result. If you know that these efforts will fail to the point where Ocwin's not allowed to acquire new rights, which is what happened at the end of the class period when Florida came in and said you cannot acquire new rights and it's going to cost you billions of dollars to get a new technology, that's a rigged result into the marketplace and it's material information that's misleading. Can I ask you a favor? Go ahead. Go ahead, Judge Brown. On paragraph 52 of your amended complaint is the train wreck quote that you're talking about. And this was an internal communication in 2014, which is before the regulator stepped in and before the class period. And the head of servicing describes the technology as an absolute train wreck. I know there's no shot in hell, but if I could change systems tomorrow, I would. So this is before the class period. And it's not somebody saying we cannot fix this. They're saying it's a terrible system. The regulators then step in and we then hear the statements that are being made from Ocwin about trying to fix the technology. But I'm looking at this statement. First of all, it's before the class period, before the regulators step in, and it's not telling me that statement in and of itself doesn't tell me there's no way it can be fixed. It tells me it's bad. But so how is this an actionable securities fraud? Well, the train wreck email is a part of it. The broken email is a part of it. The internal investigation is a part of it. The external consultants coming in is a part of it. And you have broken tracks. You have a... But they're not... They're never promising perfection. No, they're not promising perfection. And if they were earnestly disclosing that we're making efforts to fix this and we may or may not be able to do it, then that would not be an actionable fraud. But when you know that you can fix it... What if you omit that last part? I'm sorry? Making efforts and you don't have to say we may or may not get there. You just say we're making efforts. Right. Well, that's the rigged result. If you know that the efforts are going to fail, then your technically true statements are misleading. And I'm running out of time. I saved some time for rebuttal. I just want to raise the point now so I can come back to it. Puffery was a part of some of the statements. There's also the forward-looking statements that did not include puffery and the opinion statements that did not include puffery. We raised the issue of first impression with the consent order and whether or not it was an anti-fraud position. But I would also raise the issue of cautionary language when I come back. We have your case, Mr. Berg. You'll save four minutes for rebuttal. Mr. Coffey. May it please the Court, Sean Coffey on behalf of Aquin Financial, Ronald Farris, and Michael Bork, it's a pleasure to be with you this morning. There's been an evolution in the description of the complaint by the plaintiff. In paragraph six of the complaint, they actually say that Aquin contends, I think it's worth quoting it, paragraph six of the complaint, quote, during the class period, defendants repeatedly represented to investors that Aquin was in compliance with the terms of the aforementioned settlements and the extensive federal and state regulations that govern mortgage servicers. The case below was about affirmative statements that they were in compliance. It's elsewhere in the complaint as well. We invited, and the district court invited, counsel to identify where Aquin actually says it. It doesn't say that. So here we are in appeal, and it's not, well, they weren't saying they were in compliance, but they were failing to tell the market that we're never going to get there. But there's nothing in the complaint that says that either. And your honors have already put your finger on it. But let's go with the evolved theory, which is the market, as they conceded in their brief, I believe at page 24, the market knew that Aquin was not in compliance, and how could it not know? Prior to the class period, you had the settlement with the CFPB that put a national monitor in place. A few weeks before the class period, you had the New York Department of Financial Services imposing a consent order that required the former chairman and founder to leave the company, $150 million fine, and importantly, froze Aquin's ability to acquire new mortgage service rights. Mr. Berg had just mentioned that happened during the class period. Oh, no, no, no. That happened several weeks before the class period. The New York DFS, which imposed its own monitor, which was live at Aquin, said you can no longer acquire MSRs until we say so. And there's going to be hoops you have to jump through, which for a mortgage servicer means you're not going to grow. Because the way mortgage servicers get paid is they service these mortgages, you total them all up, and there's an unpaid balance, UPB. And the mortgage servicer gets a few cents out of a percentage of that. And if people pay their mortgages every month, some of that unpaid balance is paid down. And if you can't acquire any more mortgages, you have a melting ice cube. This was all known to the market before the class period began. And then you have the California issue as well. So, but let's deal with the evolved theory, which is you should have told us you couldn't get there. Nothing in the record supports that. Nothing in the complaint supports that. But to pick up on the analogy that we've heard, the train. Aquin was saying there's a hole. We all know there's a hole. The market knows we're not in compliance. Plaintiffs concede that. But we're working on it. And we're working on it, and we're putting in more resources. Our costs are going up. We're telling you they're going to go up. And, but we're working on it. And if I may, plaintiff's counsel said this is a case of soft words that are taken together, a poor picture. Well, you need to, I recommend that the court look at exhibit five below, which is, what we've done is we've taken the words that they have excised, and we've surrounded it with the words that actually surrounded in the public filings. And I think in our papers we say it's green and yellow. But in your, in what's been photocopied, the light gray is what counts, what the complaint contains. The dark gray is what was not contained, which we want to emphasize. And here's just one example. It's on page 263 of the record, and it relates to a statement that's in the complaint at paragraphs 220 and 222, where what the complaint contains is one of these statements that says, aha, they're lying to the public. And what's in the complaint is, quote, as a company, we continue to make progress in resolving our legacy issues. That's where that quote ends. But in the SEC filing, there's a comma and the following words, but there is more work to be done. And that is emblematic of how this complaint was drafted. They pick out of cautionary language, which says we've got regulators here, we've got 25 open state investigations, there's no assurance we're going to make it. There's actually a statement at one point saying given what's going on with the regulators, we don't think it's highly unlikely we will become profitable until we have significant change in our business model. So Ocwin is trying, and not only that, and it's not only saying there's a hole in the track and we're trying to fix it. To strain this analogy even further, they've got two sets of experts, technicians, railroad technicians, if you want to call it, on board or ahead of the track helping them. And that's the CFPB National Monitor, which is every three months through a process with an internal review group, an external cross checks, is telling Ocwin here's where you're not quite making enough progress, here's where you need to make some progress. Ocwin actually has a disclosure where they say we think we're going to fail one or two of these metrics, but we're trying. And then you've got the DFS monitor, this other expert that's helping them fill the hole in the track. And that expert, that monitor is at Ocwin keeping a close eye, and none of those monitors, there's no evidence that those monitors said it's hopeless. Those monitors were saying you've got to tweak this, you've got to fix that in order to strive, as you are continuing to strive, towards ultimate compliance. It strikes me, I guess, that there are two ways in which the things left unsaid may be relevant here. One, the one we were talking about on opening was sort of toward an omissions case, which, as you say, is sort of the evolved version of the case. This was principally a misstatements case, now on appeal it's become an omissions case. But it also, they also did make the argument below, right, that there were certain sort of opinion-related statements that I guess, as I understand it, under governing law are actionable if, in fact, you can prove that the speaker didn't believe the opinion, didn't sincerely hold the opinion. And there, I suppose, the unstated material might be used to prove that, in fact, the speaker didn't believe that sort of the opinion that he or she was stating. I don't think any reasonable investor who looks at those statements that were isolated in the complaint and upscales to look at the language around it would ever come to the conclusion that anything material was omitted. But if I may, just, there are probably two buckets of statements that go to your Honor's point. One is forward-looking statements. And it's quite clear in the 11th Circuit under Harris v. Ibex and others, other cases, that if forward-looking statements are accompanied by meaningful cautionary language, one does not need to turn to state of mind. And the court below correctly found that that was the instance here. With regard to puffery, the, I believe it's the Vinewood case, said that once you, that the focus is not on the mens rea of the speaker, but on the meaning of the statement that's said and its impact on the listener, that a statement of fact or puffery is what it is and has its impact on the listener, regardless of whether the speaker is a saint or a sinner. And so I think there's an effort to kind of- Puffery goes to reasonableness of our lives, right? I believe that's, yes, Your Honor, it does. And so I think there's another undercurrent here where we believe there's something the court needs to be very mindful of, because what the court below was invited to do was basically three things, and the judge did not go there. One was to accept that Ackman had said something it didn't say. I've addressed that. The second was to assume investors aren't looking at everything else that's in the mix. I've addressed that. And the third, and this goes to more public policy, is, and the last point that Mr. Berg referred to about the safe harbor under forward-looking statements, is there's an effort to expand the scope of 10B here, to conflate two elements, falsity and scienter, so that there could be instances where it may not be false, where a statement that's pure puffery can now be made actionable because of a scienter analysis. That's not the law. Mr. Berg had mentioned that the fundamental problem here was the technology. And that's what this case is really about. It's paragraph after paragraph after paragraph about how terrible the real servicing software was. And that brings this case squarely into the Santa Fe analysis, that at bottom, this is a complaint about a company that, in the plaintiff's view, was run pretty lousily. It had this software, kept trying to make it work, and it just couldn't do a good job of it. And I think in Santa Fe, the Supreme Court said, you know, we're not going to have 10B become a way to federalize what is typically a state function of internal corporate governance and management. So I think that's one of the dangers here. But let me go to a precise danger, which is plaintiff's effort to expand the exception to the statutory safe harbor for forward-looking statements by adding 12B20 to that. As I said before, forward-looking statements are immunized, frankly, if they're accompanied by meaningful cautionary language. And Congress meant to address the issue of, investors want management to talk about the future and do so with a bit more freedom than before the Private Securities Litigation Reform Act. But it said, if the SEC finds that you've committed fraud, you don't get that benefit for three years. So here, the plaintiff is trying to strip away the FLS, the forward-looking statement safe harbor for certain of the statements at issue by saying that Awkward had entered into a consent decree with the SEC in January of 2016 that dealt with a fraud statute. And the fraud and the statute they're talking about is actually Rule 12B20. Does 12B20 entail a SIENTA requirement? It does not, Your Honor. As I would assume a fraud provision would? That's absolutely the case. And there is no statute. There is no law. There is no regulation. There is no SEC letter. There is nothing to support this novel expansion of 10B, because if you're reducing an exception, you're expanding the private right of action. What they've cited to is an author, an anonymous outline that was on a website, and it's in the record because it groups under a heading of anti-fraud statutes 12B220. But we don't know who wrote it, and it's of unknown provenance. We still have to figure out for ourselves what the law is. Well, Your Honor, that's funny you should say that, because you were on a panel, SEC v. Monterosso, which while this issue wasn't directly presented, that opinion obliged the court to divide a series of statutes into two buckets. And in Monterosso, you had a section. It was a pure currium opinion, a section that said anti-fraud provisions, and there was a discussion of Section 10B, Section 17, et cetera. Next section, bookkeeping. Lo and behold, that's where 12B20 is and the other sections that were at issue in the January 2016 consent order. So let me ask you this just real quick because Monterosso is relevant, but we weren't reporting to decide in that case definitively sort of which side of the line this one was on. But so I think you're right that 12B20, if I've got it right, doesn't entail a scienta requirement. But as I read 12B20, it does pretty closely mimic 10B5B, right, the language. So you've got 10B5A, which sounds fraudish. 10B5C sounds fraudish. 10B5B sounds kind of, you know, sort of bookkeeping-ish, but it's within a statute that is labeled fraud. But so it does, 12B20 does kind of mimic 10B5B, right? Well, in terms of the misstatement piece, I agree, Your Honor. But the jury, again, 10B being a judicially created right of action, it comes with all of the things that hang around it, in particular scienta. And, Your Honor, earlier, put your finger right on it, there's no scienta requirement. And there's also a public policy issue here. As someone who represented OCWIN in that negotiation with the SEC, one could imagine a situation where in negotiating a settlement with the SEC and 12B20 is on the table where a company might decide, you know, we can't accept this settlement because we like to make forward-looking statements. Our investors want to know what we're thinking. But if we do that, we are putting ourselves at risk for 10B liability if we misspeak. We don't have that congressionally mandated safe harbor if we do this. So I think from a public policy perspective, to expand the exception to capture, for the first time, we're unaware of any case that's done this, to expand the exception of safe harbor to 12B20 would have very negative policy implications in my view. I think we understand your position, Mr. Coffey. Thank you. Mr. Berg. Your Honor, as you begin, I couldn't help but think in reading the materials here, two nameless members of this panel are Alabama Crimson Tide fans, and I couldn't help but thinking that a lot of this is what I would call Saban speak. You can see Nick Saban give a press conference, and it's like jabber, jabber, jabber, jabber, jabber, jabber, jabber, and it all sounds very convincing, and at the end of it, even me as a fan, I have no idea what he just said. It's just sort of all, you used the language earlier, kind of like soft speak. It doesn't really mean anything, and therefore, I don't really sort of invest much credence in what I'm being told. Let the record reflect. I did not endorse the proposition that Saban speak doesn't mean anything. No, I understand that, and if it's Saban speak about whether or not Jalen Hurts can start or Tua can start, but he knows they're not, then it becomes relevant to the discussion, but I just want to start. Yeah, you know what? That is puffery now. I just want to correct two factual issues before I respond to two points by Mr. Coffey, and I think it addresses this in particular. One is I made a reference to a Florida action by the attorney general. I was referencing the one April 20th, 2017 after the class period, not the New York action before, but also I'd just like to point out that omissions were alleged in the underlying complaint, and it's not a change in the allegations, and those omissions, some of those omissions alleged did not attach to the puffery arguments or the forward-looking statement arguments or the opinion statements. They were just alleged actionable misstatements that may have been technically true but were nonetheless misleading because of the material information that's left out. Even if you accept all of the puffery arguments, there's still additional statements. I don't want to gobble up your rebuttal time, which I know is limited, but do you have by chance a little tick mark of citations to the complaint that you could give us where omissions specifically are alleged as freestanding violations? Yeah, the section where it talks about the three lines of defenses that were found to not be false but not addressed to whether or not they could still be misleading given the material information that was left out. But that raises an important point, and it was raised by Mr. Coffey talking about conflating elements of falsity and scienter, and it's not a conflation. It's sequential. You have to allege false statements, identify when they were made, and why they're misleading. And then there are exceptions to liability that comes up through puffery, through Safe Harbor, or through statements characterized as opinion. But there are limits to those exceptions to liability, and knowledge is a key component to that limit. Whether or not there was an intention to deceive, and that was not addressed below, but that knowledge is accepted in district courts in this circuit and circuit courts. The famous quote that goes around the Second Circuit in Rombach about the Grand Canyon where you can't warn someone you're hiking with to watch their step knowing that the Grand Canyon lies a foot ahead, right? And the effort to fix the technology, those are facts that are not in the statements that are alleged to be misleading. They're not statements that are in the documents that are requested for judicial notice. It's part of a defense to knowledge that's being made now, but that was not challenged below. The court addressed falsity only. The motion dismissed was about falsity only. And the final point that I want to make is we're talking about the problems with technology, and the case that was referenced by Auckland Below was a company that merged and was having trouble integrating two technology platforms. And that falls into the category of mismanagement, and that's true. But if the company knew that they were having problems integrating two software platforms and concealed that information and didn't explain that they were having those problems and didn't link them to financial results that were being reported, that goes beyond mismanagement and that falls into the securities laws. But didn't everybody know about the problems that Auckland had because the regulators had stepped in? No. They knew that they had problems with servicing, but they didn't know the technology. And I'll point to one issue on loss causation, which we haven't addressed now, but emphasizes my point. When AltaSource received their neural letter saying there's problems with your platform as a whole and it doesn't work and it doesn't do what it's supposed to do, the market reacted. And it was an efficient market. The market reacted. And if everybody knew, that wouldn't be new news that caused the market to react. It would have come and gone. Unless you have any questions, I appreciate your time. Thank you, Mr. Berg. We have your case, and we will be in recess until tomorrow.